UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID BRIAN BERNEL, II,

           Petitioner,

    v.

GEORGE A. NEOTTI,

           Respondent.

No.  2:  12-cv-1871 GEB KJN P

FINDINGS & RECOMMENDATIONS

Introduction

      Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for first degree murder (Cal. Penal Code § 187), intentional and personal discharge of a firearm causing great bodily injury or death (Cal. Penal Code § 12022.53(d)), and possession of a firearm by a felon (Cal. Penal Code § 12021(a)).  Petitioner is serving a sentence of 80 years to life.

      This action is proceeding on the original petition.  (ECF No. 1.)  Petitioner raises the following claims:  1) prosecutorial misconduct; 2) ineffective assistance of trial counsel; 3) ineffective assistance of appellate counsel; 4) trial court error; and 5) cumulative error.

      After carefully reviewing the record, the undersigned recommends that the petition be denied for the reasons stated herein.

////

1

1    <u>Standards for a Writ of Habeas Corpus</u>

2           An application for a writ of habeas corpus by a person in custody under a judgment of a

3    state court can be granted only for violations of the Constitution or laws of the United States.  28

4    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

5    application of state law.  See <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>,

6    202 F.3d 1146, 1149 (9th Cir. 2000).

7           Federal habeas corpus relief is not available for any claim decided on the merits in state

8    court proceedings unless the state court's adjudication of the claim:

9                    (1) resulted in a decision that was contrary to, or involved an
                     unreasonable application of, clearly established Federal law, as
10                   determined by the Supreme Court of the United States; or

11                   (2) resulted in a decision that was based on an unreasonable
                     determination of the facts in light of the evidence presented in the
12                   State court proceeding.

13   28 U.S.C. § 2254(d).

14          Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

15   States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

16   Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

17   decision of the  Supreme Court and nevertheless arrives at different result.  <u>Early v. Packer</u>, 537

18   U.S. 3, 7 (2002) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)).

19          Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court

20   may grant the writ if the state court identifies the correct governing legal principle from the

21   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

22   case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

23   that court concludes in its independent judgment that the relevant state-court decision applied

24   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

25   unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (it is "not enough

26   that a federal habeas court, in its independent review of the legal question, is left with a 'firm

27   conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's

28   determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

1    jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter,

2    131 S. Ct. 770, 786 (2011).

3         The court looks to the last reasoned state court decision as the basis for the state court

4    judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

5    "and the state court has denied relief, it may be presumed that the state court adjudicated the

6    claim on the merits in the absence of any indication or state-law procedural principles to the

7    contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

8    that "there is reason to think some other explanation for the state court's decision is more likely."

9    Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

10        "When a state court rejects a federal claim without expressly addressing that claim, a

11   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

12   presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

13   1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a

14   federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de

15   novo review of the claim.  Id., at 1097.

16        Where the state court reaches a decision on the merits but provides no reasoning to

17   support its conclusion, the federal court conducts an independent review of the record.

18   "Independent review of the record is not de novo review of the constitutional issue, but rather, the

19   only method by which we can determine whether a silent state court decision is objectively

20   unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

21   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

22   basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must

23   determine what arguments or theories supported or, . . . could have supported, the state court's

24   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

25   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at

26   786.

27   ////

28   ////

3

Factual Background

The opinion of the California Court of Appeal contains a factual summary of petitioner's offense. After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

> Defendant admitted he killed Bushnell on February 20, 2007, but sought to reduce his culpability by showing he killed her because he thought she was signaling to assassins to kill him. Because defendant's testimony largely coincided with the prosecution evidence, we blend it into our factual recitation.
>
> Defendant testified he loved Bushnell, but they had a dysfunctional relationship based on their "fast" life as drug dealers, and they were physically abusive toward each other. He usually obtained 20–pound loads of high-grade marijuana from Humboldt County growers and would sell it in central or southern California, such as in Fresno. He would then buy methamphetamine and bring it back to sell in Humboldt County. The growers would "front" the marijuana, and defendant netted about $500 per pound, or $10,000, for the marijuana. He would do several runs per week, using methamphetamine to stay awake.
>
> Defendant had several guns for protection, including the one that he used to shoot Bushnell, and Bushnell had a "girly girlish" gun that she carried in her purse.
>
> During one trip in January 2007, some Hispanic gang members— "'eses'"—took a 20–pound load of marijuana without paying for it. This represented a $10,000 loss to defendant and Bushnell, but a $60,000 loss to the growers. Defendant did not want to see the growers until he had made the money because of the likely adverse consequences. As he testified: "There was no talking it out or anything like that."
>
> When defendant picked up more marijuana, Bushnell was kidnapped, threatened, and then released, but the perpetrators took her cell phone, which had crucial telephone numbers in it. Defendant obtained more marijuana and picked up Bushnell, but defendant was arrested. He made bail on February 12 or 13, 2007.
>
> Bushnell's mother testified her daughter called on February 12, 2007, to say she "was tired of all the crazy things that were happening and that she just wanted to get back to her normal life. Get a normal job." Her daughter was afraid of defendant, but loved him.
>
> Defendant testified that after he made bail, the couple decided to make another run, so they got more marijuana in Laytonville, then went to his mother's house in Kingsburg. Defendant testified that between then and when he shot Bushnell, he did not sleep because of "severe methamphetamine use." Defendant dropped Bushnell at his mother's house and went to sell marijuana. This was the day

before a SWAT incident.

Defendant's mother, Joann Bernel, told an investigator that defendant had delusions he was a drug kingpin. Beginning in December 2006, Bushnell stayed at her house for periods of time, sometimes with defendant and sometimes by herself.

On February 17, 2007, Bushnell told Joann Bernel that defendant was in trouble because someone had stolen marijuana they had been fronted. Bushnell said that she had been kidnapped in Humboldt County because of this problem. Bushnell had a gun. Bushnell told defendant's mother that defendant had hit her. Bushnell was "[u]p and down" that night, concerned about people watching the house, and Joann Bernel had seen a woman watching the house about three days before.

The next morning, when Joann Bernel got up, she saw defendant asleep in the garage. Bushnell took breakfast out to defendant, and Joann Bernel heard Bushnell and defendant arguing. Eventually, defendant displayed a shotgun, stating "everybody was after him and nobody was leaving the house," and he was "going to shoot me and shoot her." "He was foaming at the mouth. His eyes were bulged to where they were going to pop out. It wasn't him. It was the devil." In the past, when defendant used methamphetamine, his mother could see how it changed his behavior; it made him "[h]yper" and "[p]aranoid." This time, he seemed insane from drugs, worse than she had ever seen him. Defendant dragged Bushnell screaming into the garage, and Joann Bernel fled with her daughter to a neighbor's house to call 911. A SWAT team responded to her house.

Defendant testified he suspected that he was being followed, and that his mother had told him she had seen people watching her house. Defendant testified he was "tweaked out on crank," infuriated, "And I thought everybody was out to -- was against me." Before this, he had learned from friends that while she had been kidnapped, Bushnell had talked against. He admitted pointing a shotgun at Bushnell and saying he would blow her head off. He also hit her once with the shotgun and she fell, causing a bruise later found on her tailbone.

Defendant testified that after his mother ran out of the house with his sister, he and Bushnell walked to the river and watched the SWAT team set up.

Eventually, defendant arranged to buy a Honda for them to use.

Defendant testified he thought the authorities were after them. He also testified he was "[s]everely" using drugs during this period. He used about an ounce every three days in this period, but later testified it was an ounce every four to five days.

Defendant testified he and Bushnell drove to a friend's house in Riverbank, with defendant still using methamphetamine. Three men showed up, and defendant assumed his friend had learned he was

5

wanted by the Humboldt drug growers, which made defendant nervous. When asked how he was feeling then, defendant testified, "The longer you are awake, the more your mind wanders."

Although they had planned to stay overnight, defendant and Bushnell left, and when the three men began to follow them out, defendant became more suspicious. As they were leaving the house, Bushnell cut her finger on razor wire. She was bleeding "pretty good" but defendant wanted to get away from that house, so he drove about 30 minutes toward Flag City. He was speeding because he thought the men were following him. While he was "tweaking" in the car, Bushnell pointed her gun at him and screamed, he slammed on the breaks, and her head hit the windshield. Defendant did not want to stop, but he was running low on gas.

Shortly after midnight on February 20, 2007, Sonia Mesa was the cashier at the Flag City truck stop, near the intersection of Highway 12 and Interstate 5, west of Lodi. Defendant asked for $30 worth of gas, but when Mesa walked toward the counter, "He just kind of laughed a little to himself" and ran outside. She heard a noise and looked outside. She saw a woman yelling at defendant, "And then he had a gun in his hand and I heard another noise and she kind of went to the floor, a little slowly[.]" Mesa got scared and called 911.

A customer heard three shots, then saw a man he believed to be defendant get into a car and drive away. The customer testified that he heard "an extremely short pause" between the first shot and the other shots.

The gas station owner testified that he showed peace officers some images from his camera system, and he prepared a CD capturing those images. Four gunshots could be heard when the owner and the officers viewed the original, but the audio signal could not be transferred to the CD. However, a detective recorded the audio signal onto a handheld recorder, and the detective testified he could hear four gunshots, "two distinct gunshots, and then the following two, the last two, were very rapid in succession." This matched the four shell casings recovered at the scene. The detective also saw two marks on the concrete that appeared to be recent bullet strikes, and he found fragments consistent with a bullet striking concrete.

Defendant testified he and Bushnell were arguing when he pulled into the gas station, and Bushnell had her gun with her. Defendant was "high" at this point and still thought people were following him. He put $30 on the counter for gas and then saw Bushnell get out of the car, so he ran outside. She was waving her hands and yelling "I'm done" and "I'm going to get these mother fuckers off my ass right now." Defendant testified: "She was waving. And I kind of see some motion over here on the side, I thought she was running towards them. I thought they were there at the time. And I—I thought they were going to kill me." "I figured, you know, hey, either she's going to kill me or they are going to kill me, either way. Because she wanted this over now. We just had that argument.... She just wanted this over with. She wanted these people off her ass. She didn't care what was going—anything about me anymore. So

6

she was going to help them out."

Defendant described "[t]weak" or "crank monsters," "things that aren't there. You see them, but they are not really there. Like shadows moving, things running, people in trees." He stated that being "spun out" was "a feeling that you can't really describe. It's ... like being another person. It's like an alter ego of sorts." He testified "my mind wasn't working right at that time."

After watching the camera images from the gas station, defendant testified he now knows Bushnell was not armed when she was out of the car. He then testified as follows:

"Q. Okay. At the time you thought she was waving something and you thought you saw a movement, right?

"A. Correct.

"Q. Do you think that was one of these hallucinations, sort of movement things or—

"A. Yes, I do.

"Q. In retrospect?

"A. Now that I look back at things and I—I understand that, you know, that that possibly—that didn't happen. You know, it was [a] figment of my imagination. It was my mind running off from me. I didn't know what was going on. At the time, all I thought was, I'm going to die. This is it. These guys have caught back up with me."

Defendant testified that because he thought he was going to be killed, he shot Bushnell. The first shot was from about 20 feet away. He denied shooting her while she was on the ground. He conceded the camera does not show him looking around for any other people, and he explained: "I was more worried about getting out of there at the time. Like I said, I saw a motion over to the side, my peripheral vision. [All] I see is a slight movement and if that is—so I'm trying to get out of there as soon as possible."

The CD exhibit depicting the images from the gas station cameras shows a series of discrete images with noticeable breaks, so that the motion is jerky. However, it shows defendant approaching Bushnell, then she falls out of sight behind a cleaning station, consistent with having been shot from about 20 feet, as defendant testified. Then defendant walks toward her and points down, consistent with shooting her while she was on the ground, as corroborated by the fresh bullet marks in the concrete.

The pathologist who conducted the autopsy on Bushnell testified that Bushnell had three gunshot wounds, one into the left chest exiting the right upper back, one into the right breast through the chest and out through the right upper arm, and one through her left forearm. She also had minor bruises around her neck and cheeks, and bruises several days old on her hips and lower extremities. The

neck wound "was indefinite, probably a few days old." She also had a bruise in her tailbone area that was several days old. There was a jagged wound on her left little finger that looked fresh and would have bled a lot. She had a blow to the mouth that "[c]ould have happened right before she was shot or several hours before." The pathologist did not note any missing hair, but testified he might not have noticed if a small patch was gone. Bushnell had no drugs or alcohol in her blood.

After shooting Bushnell, defendant fled, and in doing so drove his Honda into some berry bushes about a half-mile from Flag City. A criminalist found blood inside and outside of the Honda, and a clump of human hair on the passenger seat that had been "forcibly removed." The gun used to kill Bushnell was found in a grassy area near the shoulder of Highway 12 near Flag City.

Eventually, with the aid of others, defendant fled to Mexico.

Defendant had felony convictions for first degree burglary in 1997 and second degree burglary in 1999.

Dr. Christina Antoine, a defense psychiatrist, testified about the effects of methamphetamine, but had not examined defendant. She testified hallucinations can be hearing, seeing or feeling things that are not true. Methamphetamine has toxic effects on the brain and can cause psychosis, or can exacerbate a person's existing mental illness. Long-term use can cause permanent changes in brain chemistry, so that stopping the drug may not stop its effects. "[M]ethamphetamine intoxication" (psychotic disorder secondary to methamphetamine) can appear similar to schizophrenia and can cause visual and auditory hallucinations and delusions, as well as paranoia. Methamphetamine use can cause drooling and possibly foaming at the mouth.

Defendant's former girlfriend testified that sometimes defendant would be "spun" on methamphetamine, but she had not seen him in about two years.

The prosecutor's closing argument emphasized that this was a cold, calculated, killing: Defendant first shot Bushnell from 20 feet away, then walked up and shot her while she was on the ground, after having threatened to kill her before. The prosecutor noted that defendant did not look around, arguing this meant defendant did not really believe there were killers lurking in the area. Defense counsel argued imperfect self-defense at length and emphasized defendant's methamphetamine-fueled perceptions. In rebuttal, the prosecutor argued no evidence corroborated defendant's story, he was lying, and he had not been delusional.

After deliberating for about two and a half hours, the jury convicted defendant of first degree murder, found he intentionally and personally discharged a firearm, causing great bodily injury or death, and possessed a firearm after a felony conviction. (Pen.Code, §§ 187, 12022.53, subd. (d), 12021, subd. (a).)

1
2
3
4
5

The trial court found true the allegations that defendant had a prior serious felony conviction that also qualified as a strike. (Pen.Code, §§ 667, subds.(a)(1), (b)-(i), 1170.12.) The trial court sentenced defendant to 25 years to life for murder, doubled to 50 years to life for the strike, added 25 years for the firearm allegation, and added another five years for the serious felony allegation, for a total of 80 years to life. The trial court imposed but stayed (Pen.Code, § 654) a midterm sentence of two years, doubled to four for the strike, for the firearm possession count.

6   (ECF No. 11 at 40-50.)

7   Claims 1, 4 and 5

8   Respondent argues that claims 1, 4 and 5 are procedurally barred.  Claim 1 alleges

9   prosecutorial misconduct during closing argument.  Claim four alleges that the trial court erred in

10   responding to the prosecutorial misconduct.  Claim 5 alleges cumulative error.

11   *Legal Standard*

12   A federal court will not review questions of federal law decided by a state court if the

13   decision rests on a state law ground that is independent of the federal ground and is adequate to

14   support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729–30 (1991).  In cases in which a

15   state prisoner has defaulted his claims in state court pursuant to an independent and adequate state

16   procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate

17   cause for the default and actual prejudice as a result of the alleged violation of federal law, or

18   demonstrate that a failure to consider the claims will result in a fundamental miscarriage of

19   justice.  Id. at 750

20   *Independent and Adequate Grounds for Procedural Bar*

21   Petitioner raised claims 1, 4 and 5 in habeas corpus petitions filed in state court.  The San

22   Joaquin County Superior Court denied these claims on the grounds that they should have been

23   raised on direct appeal, citing In re Harris, 5 Cal.4th 813, 829 (1993), and In re Walker, 10 Cal.3d

24   764, 773 (1974.)  (ECF No. 11 at 66-67.)   The California Court of Appeal and the California

25   Supreme Court denied petitioner's petitions raising these claims without comment or citation.

26   (ECF No. 1 at 10, 48.)  Where, as here, the California Supreme Court and California Court of

27   Appeal deny a petitioner's claims without comment, the "silent" denials are considered to rest on

28   the last reasoned decision on these claims, in this case, the grounds articulated by the Superior

9

1   Court.   See Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).

2          Respondent argues that claims 1, 4 and 5 are barred based on the Superior Court's finding

3   that these claims should have been raised on direct appeal.   Accordingly, the undersigned

4   considers whether the procedural grounds relied on by the Superior Court were adequate and

5   independent state procedural rules.

6          In Harris and Walker, the California Courts upheld the rule set forth in In re Dixon, 41

7   Cal.2d 756 (1953).   In Dixon, the California Supreme Court held that "habeas corpus cannot

8   serve as a substitute for an appeal, and, in the absence of special circumstances constituting an

9   excuse for failure to employ that remedy, the writ will not lie when the claimed errors could have

10  been, but were not, raised upon a timely appeal from a judgment of conviction."   Dixon, 41

11  Cal.2d at 759.   The Dixon rule satisfies the "independent and adequate" requirement for

12  procedural bars.   See Smith v. Crones, 2010 WL 1660240 at *1 (E.D. Cal. 2010) (Chief Judge

13  Kozinski concluding that Dixon rule is independent and adequate).

14         Accordingly, claims 1, 4 and 5 are procedurally barred unless petitioner can demonstrate

15  cause and prejudice for the default or that a fundamental miscarriage of justice will occur if the

16  claims are not reviewed.

17         *Cause and Prejudice*

18         In his reply to respondent's answer, petitioner argues that he defaulted claims 1, 4 and 5

19  because appellate counsel failed to raise these claims on direct appeal.   Ineffective assistance of

20  appellate counsel, if independently pleaded, exhausted and proved, can constitute "cause" for

21  purposes of the cause and prejudice showing necessary to overcome a procedural default.   Murray

22  v. Carrier, 477 U.S. 478, 488 (1986).   Attorney error short of constitutionally ineffective

23  assistance of counsel does not constitute cause and will not excuse a procedural default.   See

24  McCleskey v. Zant, 499 U.S. 467, 494 (1991).

25         In his state habeas petitions, petitioner did not exhaust or raise claims alleging that

26  appellate counsel was ineffective for failing to raise claims alleging cumulative error or trial court

27  error.   (Respondent's Lodged Document 10 at 20-23.)   Accordingly, the undersigned finds that

28  petitioner has not demonstrated cause for his default of these claims, i.e., claims 4 and 5.

1    In his state habeas petitions, petitioner exhausted his claim alleging ineffective assistance

2    of appellate counsel for failing to raise his prosecutorial misconduct claims, claim 1.  (Id.)

3    Accordingly, the undersigned herein considers whether petitioner has demonstrated cause for the

4    default of his prosecutorial misconduct claims, i.e., whether appellate counsel was ineffective for

5    failing to raise these claims.

6    The Superior Court denied petitioner's ineffective assistance of appellate counsel claim

7    for the reasons stated herein:

8    As for Petitioner's claims of Ineffective Assistance of Trial and
9    Appellate Counsel:

10   A claim of ineffective assistance of counsel has two
     components: "First, the defendant must show that counsel's
11   performance was deficient.  This requires showing that
     counsel made errors so serious that counsel was not
12   functioning as the "counsel" guaranteed the defendant by
     the Sixth Amendment.  Second, the defendant must show
13   that the deficient performance prejudiced the defense.  This
     requires that counsel's errors were so serious as to deprive
14   the defendant of a fair trial, a trial whose result is reliable.'
     [Citation.]  To establish ineffectiveness, a 'defendant must
15   show that counsel's representation fell below an objective
     standard of reasonableness.'   [Citation.]   To establish
16   prejudice he 'must show that there is a reasonable
     probability that, but for counsel's unprofessional errors, the
17   result of the proceeding would have been different.   A
     reasonable probability is a probability sufficient to
18   undermine confidence in the outcome.'   [Citation.]
     (Williams v. Taylor (2000) 529 U.S. 362, 390-391, 120 S.
19   Ct. 1495, 1511-1512, 146 L.Ed.2d 389, citing Strickland v.
     Washington (1984) 466 U.S. 668, 694, 104 S.Ct. 1052, 80
20   L.Ed.2d 674; In re Jones (1996) 13 Cal.4th 552, 561, 54
     Cal.Rptr.2d 52, 917 P.2d 1175.)  The ineffectiveness must
21   "deprive the defendant of a substantive or procedural right
     to which the law entitles him." (Williams v. Taylor, supra,
22   529 U.S. at p. 393, 120 S. Ct. at p. 1513, fn. omitted.)

     In re Vargas (2000) 83 Cal.App.4th 1125, 1132-1133, 100
23   Cal.Rptr.2d 265.

24   Petitioner must set forth the facts supporting the allegations in the
     petition with particularity.  Vague or conclusory allegations do not
25   warrant relief.  People v. Duvall (1995) 9 Cal.4th 464, 474, 37
     Cal.Rptr.2d 259.  The petition should include copies of "reasonably
26   available documentary evidence in support of claims..."   Duvall,
     supra, 9 Cal.4th at 474, 37 Cal.Rptr.2d at 265.  In this petition,
27   Petitioner has presented no independent objective evidence showing
     his attorneys' performances fell below the objective standard of
28   reasonableness, nor has he presented any independent objective

11

evidence showing that if not for his attorneys' "errors," there would have been a different result in Petitioner's trial or appellate proceedings.   Petitioner has only presented his own self-serving statements.    This is not sufficient evidence to substantiate Petitioner's claim.   Chavez v. Guirbino (2006) U.S. Dist. LEXIS 8541.

Furthermore, in particular to Petitioner's appellate counsel, appellate counsel "performs properly and completely when he or she exercises discretion and presents only the strongest claims instead of every conceivable claim."   In re Robbins (1998) 18 Cal.4th 810, citing Jones v. Barnes (1983) 463 U.S. 745, 752; Smith v. Murray (1986) 477 U.S. 527, 536.    Petitioner has presented no evidence showing that appellate counsel did anything but exercise discretion in deciding not to present the above issues related to the alleged prosecutorial misconduct because said issues were not the strongest claims.

(ECF No. 1 at 8-9.)

In Jones v. Ryan, 691 F.3d 1093, 1101 n.2 (9th Cir. 2012), the Ninth Circuit observed that, "We have not yet determined whether federal courts should give AEDPA deference to the state court determination on an ineffective assistance of counsel claim when deciding whether that claim constitutes cause for procedural default."  In Jones, the Ninth Circuit declined to decide the issue, finding that, in that case, even on de novo review, the state appellate court's merits determinations were correct.  The undersigned  also finds, for the reasons stated herein, under either standard petitioner has failed to show that he received ineffective assistance of appellate counsel based on appellate counsel's failure to raise his claims of prosecutorial misconduct.

At the outset, the undersigned observes that on appeal, appellate counsel argued that the trial court erred in giving the pattern instruction on hallucinations.  (ECF No. 11 at 50.)  Appellate counsel argued that there was no evidence of hallucinations and that the instruction impaired his claim of imperfect self-defense.  (Id.)

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  Smith v. Robbins, 528 U.S. 259, 285 (2000).  First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  Smith, 528 U.S. at 285. Petitioner must overcome the "strong presumption that [appellate] counsel's conduct [fell] within

1  the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.  Second, the

2  petitioner must show prejudice, which in this context means that the petitioner must demonstrate

3  a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner

4  would have prevailed in his appeal.  <u>Smith</u>, 528 U.S. at 285–86;

5      With regard to the first prong, the Supreme Court has held that appellate counsel need not,

6  and should not, raise every nonfrivolous claim.  <u>Smith</u>, 528 U.S. at 288.  Instead, appellate

7  counsel should select from among the various appealable issues "in order to maximize the

8  likelihood of success on appeal."  <u>Id.</u>  In discussing this standard, the Supreme Court noted that

9  "it is still possible to bring a <u>Strickland</u> claim based on counsel's failure to raise a particular

10  claim, but it is difficult to demonstrate that counsel was incompetent.  <u>See</u>, <u>e.g.</u>, <u>Gray v. Greer</u>,

11  800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than

12  those presented, will the presumption of effective assistance of counsel be overcome")."

13      In evaluating whether appellate counsel was ineffective for failing to raise petitioner's

14  prosecutorial misconduct claims, the undersigned considers the following standards for

15  prosecutorial misconduct claims.

16      To demonstrate prosecutorial misconduct based on a prosecutor's comments at trial, a

17  petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness

18  as to make the resulting conviction a denial of due process.'"  <u>Darden v. Wainwright</u>, 477 U.S.

19  168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).)  Under this

20  standard, only egregious prosecutorial misconduct can give rise to a constitutional claim.  <u>See</u>

21  <u>Duckett v. Godinez</u>, 67 F.3d 734, 743 (9th Cir. 1995).  A prosecutor's comments in summation

22  constitute grounds for reversal only when the remarks cause actual prejudice.  <u>Shaw v. Terhune</u>,

23  380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial

24  misconduct in summation).  Moreover, a prosecutor must have "reasonable latitude" to fashion

25  closing argument.  <u>United States v. Molina</u>, 934 F.2d 1440, 1445 (9th Cir. 1991).

26      In the petition, petitioner cites several instances of alleged prosecutorial misconduct in

27  closing argument.  Petitioner first cites the following argument (ECF No. 1 at 24):

28  ////

1   Prosecutor:  Count 1, the defendant is charged with unlawful killing
    of a human being with express or implied malice.  That is the
2   definition of murder.  There are two degrees of murder.  There's
    first-degree murder and there is second-degree murder.  Expressed
3   malice equals first degree, implied equals second degree.

4   Petitioner's Counsel:  That's a misstatement of the law, judge.

5   Court:  I agree.

6   Prosecutor:  We will talk about each of those in detail, but let me
    tell you this ---
7
    Petitioner's Counsel:  Would you admonish the jury?
8
    Court:  Wait a second.  As far as the instruction on definition of
9   murder, I will instruct the jury as to that, and the jury should follow
    my instructions.
10

11  (Reporter's Transcript ("RT") at 1107-08.)

12      In the section of the transcript quoted above, the trial court did not explicitly admonish the

13  jury as requested by defense counsel.  However, the trial court agreed with defense counsel that

14  the argument was a misstatement of the law and instructed that jury that they should follow the

15  instruction regarding the definition of murder that would be later read to them.  The trial court

16  later instructed the jury as to the definition of first and second degree murder.  (RT at 1229-31.)

17  A jury is presumed to follow its instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000).

18  Based on these circumstances, the prosecutor's argument did not prejudice petitioner.

19  Accordingly, appellate counsel was not ineffective for failing to raise a prosecutorial misconduct

20  claim based on this argument.

21      Petitioner next cites the following closing argument as alleged prosecutorial misconduct:

22  Prosecutor:  Frankly, ladies and gentlemen, if you believe the
    defendant intended to kill her like he said he said he did, second-
23  degree murder doesn't apply.

24  Petitioner's Counsel:  That's – that is a misstatement of the law,
    judge.
25
    Prosecutor:  With regard to ---
26
    Court:  Wait.  Wait.  Wait.
27
    Petitioner's Counsel:  It's a gross misstatement of the law and this
28  needs to be corrected.  That's twice she's done this.

14

1    Court:  I'll sustain it.

2    Petitioner's Counsel:  I'd ask that the jury be admonished and that
     this misconduct be noted.

3

4    Court:  I wouldn't characterize it as misconduct.  I'll instruct the
     jury to disregard that statement.

5    Prosecutor:  Second-degree murder is the lawful killing of a human
     being with implied malice.

6

7    Petitioner's Counsel:   Again, that's one option.   That is a
     misstatement of the law.

8    Court:  It's not a misstatement.  It is an option.  It's legitimate
     argument.

9

10   Petitioner's Counsel:  But---

11   Court:  Wait.  Wait.  Wait.  I'm overruling your objection.

12   (RT at 1117-18.)

13          The trial court above sustained trial counsel's objection and advised the jury to disregard

14   the prosecutor's improper argument that it must find petitioner guilty of first degree murder if it

15   found that he intended to kill the victim "like he said he did."  As noted above, the trial court

16   went on to define first and second degree murder for the jury.  (RT at 1229-31.)   Based on these

17   circumstances, the prosecutor's argument did not prejudice petitioner.  See Weeks v. Angelone,

18   528 U.S. 225, 234 (2000) (a jury is presumed to follow jury instructions).  Accordingly, appellate

19   counsel was not ineffective for failing to raise a prosecutorial misconduct claim based on this

20   argument.

21          Defense counsel also objected to the prosecutor's argument that second-degree murder is

22   the lawful killing of a human being with implied malice.  The trial court correctly noted that

23   implied malice was, technically, one theory for convicting petitioner of second degree murder.

24   Because the jury was later properly instructed as to the definition of first and second degree

25   murder, petitioner was not prejudiced by this argument and a challenge to this argument by

26   appellate counsel would have been rejected.  Accordingly, appellate counsel was not ineffective

27   for failing to raise this claim.

28   ////

Petitioner next argues that the prosecutor argued "facts not in evidence." (ECF No. 1 at 25.) Petitioner cites the prosecution's argument that petitioner told the victim not to get out of the car. (RT at 1114.) Defense counsel objected that this was not a fact in evidence. (Id.) The trial court ruled that it was a reasonable inference. (Id. at 1115.) In order to put this argument in context, the undersigned sets forth the prosecutor's argument leading up to the at-issue statement:

> Prosecutor: Premeditation. You know, the defendant took the stand and I got to ask him questions about every single scene in the video, surveillance video, and he pretty much gave an answer, whether you believe all his answers or not, but he gave answers, except for this scene. This scene, ladies and gentlemen, is – if you can see the time on there, it says 0049. This is when the car pulls up to the gas station and they sit there for two minutes. Do you see how long that period of time was? That wasn't even 30 seconds that I stood there. Two minutes is a long time. And I asked the defendant what was going on in that car during that two minutes, and he didn't have an answer.

> Well, I was, um, finishing a cigarette and we were continuing to argue about the situation, you know, our situation. Well, you can infer from the evidence that the defendant said something to Jennifer. We don't get to hear what Jennifer said because the defendant silenced her, so we can't bring her in to have you – to have her tell us, but you can infer, based on the evidence, based on what the defendant told you his relationship was like with Jennifer, based on what his – he was – what he was like – and we'll talk about that – you can infer that he said, "Don't get out the car or I will kill you. Don't move or I will kill you."

> It's about power. It's about control. It's about him silencing her when she's yelling at him, slamming on the brakes and having her face hit the windshield. It's about him being her boss and telling her what to do.

> Now, we know he likes that power. Remember, ladies and gentlemen, he was telling us about his profession, his business. People – he goes to people's houses that don't normally allow people to smoke in their home, but they hand him an ashtray. He goes to people's houses where they don't really allow dogs in their home but, yet, his dogs run amuck through their house.

> It's about power. It's about control. And it's about staying in this car, "Don't get out or I will kill you."

> Prior to pulling the trigger, the defendant had decided to kill her. Defendant told her not to get out of the car, or something to that effect.

> Defense Counsel: That's a fact not in evidence.

> Trial Court: It's a reasonable inference. I'll allow it.

16

1   (RT at 1113-15.)

2          In the answer, respondent argues that the prosecutor's argument was a reasonable

3   inference.  Respondent cites testimony from the trial demonstrating petitioner's abuse and control

4   over the victim, Jennifer.  Respondent cites testimony from petitioner's mother, Joann Bernel, in

5   which she describes an incident where petitioner told Jennifer she could not leave.  (RT at 350-

6   55.)  Petitioner and Jennifer were visiting Joann Bernel.  (Id.)  Jennifer told Joann Bernel that she

7   wanted to go home to Humboldt County and asked Bernel to take her to the bus station.  (Id. at

8   355.)  Petitioner then came through the back door and said that Jennifer was not going anywhere.

9   (Id.)  Petitioner then made Jennifer go into the garage where they loudly argued.  (Id. at 456.)

10  Bernal then went out into the garage and pulled Jennifer into the house.  (Id.)  Petitioner then

11  came into the house carrying a shotgun.  (Id.)  Petitioner pointed the gun at Jennifer and Bernal

12  and said everybody was against him and nobody was leaving the house.  (Id. at 357.)  He said he

13  was going to shoot Jennifer and Bernal.  (Id.)

14         Respondent also cites petitioner's testimony where he admitted slamming on the car

15  brakes as he and Jennifer were driving down the highway because she was mad at him.  (Id. at

16  862-63.)  Respondent also cites the testimony from witnesses describing the shooting.  The

17  cashier from the mini-market testified that as she was walking behind the cash register so that

18  petitioner could pay, petitioner ran outside.  (Id. at 197.)  Petitioner "kind of laughed to himself"

19  as he was went out the door.  (Id.)  Dennis McBride was driving from the mini-mart when he saw

20  petitioner do something with his right arm.  (Id. at 244-53.)  McBride heard three shots and

21  watched petitioner drive off.  (Id.)

22         Respondent argues that based on the evidence cited above, the prosecutor properly argued

23  that one could infer that petitioner had threatened Jennifer not to leave the car and he then shot

24  her dead when she did.

25         Prosecutors are entitled to argue reasonable inferences from the evidence.  See Ceja v.

26  Stewart, 97 F.3d 1246, 1253–54 (9th Cir. 1996).  The undersigned agrees with the trial court and

27  respondent that it was reasonable to infer from the evidence that ptitioner told Jennifer not to

28  leave the car.  Moreover, the jury was instructed that nothing the attorneys say is evidence.  (RT

17

at 1215.)  For these reasons, the prosecutor's argument that petitioner told the victim not to leave

the car did not violate petitioner's right to due process.  Accordingly, appellate counsel was not

ineffective for failing to raise a claim alleging prosecutorial misconduct on this ground.

Petitioner next argues that the prosecutor committed misconduct by engaging in

"sandbagging."  (ECF No. 1 at 25.)  In support of this argument, petitioner cites the following

portion of the prosecutor's closing argument:

> Prosecutor:  Oh, and I just want to say, I have a brother that's used
> methamphetamine.
>
> Petitioner's Counsel:  I'm going to object to her testifying.  She did
> it once before, it's objectionable.
>
> Court:   You can discuss commonly known principles without
> getting specifically personal.
>
> Prosecutor:    Thank  you.    And  the  characteristics  of  a
> methamphetamine addict are not the same with each person, and
> that's what the doctor told you. She told you that's different.
> Everybody reacts differently.  My situation, I never seen [sic] my
> brother violent.  Mr. Bernal –
>
> Petitioner's Counsel:  I'm going to make the same objection there.
> That was going back to the same thing.
>
> Prosecutor:  We talked about your ex-wife, Mr. Quinn.
>
> Court:  There was no objection, but –
>
> Prosecutor:  Out of courtesy.
>
> Court:  You should avoid things specific, not in evidence.
>
> Prosecutor:   What I'm saying to you is other than the defendant
> using methamphetamine for a way of explaining his conduct to you,
> it may explain why he gets angry, but it doesn't excuse what he
> does.
>
> The amount of drugs that the defendant said he uses as he's
> testifying, every five minutes, every time he gets a chance, he's
> supposedly using methamphetamine.  The guy would be dead if he
> smoked as much methamphetamine as he says he did.  Now, the
> photograph, the lighting may be a little different, but look at it,
> looks like a healthy, good looking guy.  Doesn't look like someone
> that's been using meth as consistently as he says he is.  You have
> your own common knowledge of what people look like or what
> people that use meth look like.
>
> We have that poster board that's over there if you want to look at it.
> Methamphetamine eats away your body, that's what the doctor told

1   us.  He's not using the methamphetamines to the extent that he says
    he is.  He's setting that up for a defense.
2

3   (RT at 1211-12.)

4        Petitioner first argues that the prosecutor's statements regarding her brother were

5   improper.  (ECF No. 1 at 25-26.)  As indicated above, the trial court sustained defense counsel's

6   objections to the prosecution's references to her brother and directed the prosecutor to avoid

7   getting personal.  In addition, as noted above, the jury was instructed that nothing the attorneys

8   say is evidence.  (RT at 1215.)  For these reasons, petitioner was not prejudiced by the

9   prosecutor's references to her brother during closing argument.  Accordingly, appellate counsel

10  was not ineffective for failing to raise a claim of prosecutorial misconduct on this ground.

11       Petitioner also argues that the prosecutor's comments about his appearance in the

12  photograph were improper because they contradicted her earlier statement that not all

13  methamphetamine addicts are the same, thus confusing the jury.  (ECF No. 1 at 26.)  At trial,

14  defense witness Antoine testified that methamphetamine use causes appearances to change.  She

15  testified that people lose a lot of weight and they look 30 years older than their stated age.  (RT at

16  798.)  She also testified that methamphetamine use can affect skin and teeth.  (Id.)  Based on this

17  testimony, the prosecutor's argument that petitioner's healthy appearance in his photograph was

18  not consistent with his testimony regarding the amount of methamphetamine he used was not

19  improper.  This argument did not violate petitioner's right to a fair trial.  Accordingly, appellate

20  counsel was not ineffective for failing to raise a prosecutorial misconduct claim on this ground.

21       Petitioner also argues that the prosecutor's argument that petitioner would be dead if he

22  used as much methamphetamine as he testified to was improper because only an expert witness

23  would be able to offer such an opinion.  (ECF No. 1 at 26.)  It is well settled that a prosecutor

24  "has no business telling the jury his individual impressions of the evidence," and may not express

25  his or her personal opinion of the defendant's guilt or his belief in the credibility of witnesses.

26  United States v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992) ("[a] prosecutor has no business

27  telling the jury his individual impressions of the evidence.  Because he is the sovereign's

28  representative, the jury may be misled into thinking his conclusions have been validated by the

19

1  government's investigatory apparatus."); <u>United States v. McKoy</u>, 771 F.2d 1207, 1210–11 (9th

2  Cir. 1985).

3       The prosecutor's argument that petitioner would be dead if he was using as much

4  methamphetamine as he testified to was improper because it was her personal impression of the

5  evidence. The undersigned can find no evidence in the record supporting this statement.

6  However, for the following reasons, this argument was harmless because it did not have a

7  "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

8  <u>Abrahamson</u>, 507 U.S. 619, 638 (1993).

9       As noted above, the jury was instructed that nothing the attorneys say is evidence. (RT at

10  1215.) A jury is presumed to follow its instructions. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234

11  (2000). For this reason, the undersigned presumes that the jury knew that the prosecutor's

12  argument regarding petitioner's methamphetamine use was not evidence.

13       In addition, as noted by the California Court of Appeal on direct appeal, the evidence of

14  petitioner's guilt was overwhelming:

15  > The evidence of defendants' guilt was overwhelming. He had
16  > threatened to blow Bushnell's head off a few days before, at his
17  > mother's house. Based on the gunshot wounds and bullet strikes in
   > the concrete, as well as the camera images, defendant shot Bushnell
17 > from a distance, then walked up to her after she fell and shot
   > directly into her again. He then fled. As the prosecutor argued, the
18 > fact that defendant did not look around as he approached Bushnell
   > undermined his claim that he actually was in fear, because if he had
19 > honestly thought that Bushnell was signaling to assassins, he would
   > naturally have been looking around to check for danger. His claim
20 > that he actually thought Bushnell was armed and was signaling to
   > assassins when he shot her lacked any direct corroboration. The
21 > fact he was a twice-convicted felon cast doubt on his credibility,
   > and the fact he as on trial for first degree murder gave him a strong
22 > motive to fabricate his claim that he was hallucinating due to
   > methamphetamines.
23

24  (ECF No. 11 at 62-63.)

25       Because the evidence that petitioner committed first degree murder was strong, the

26  prosecutor's improper argument regarding the amount of methamphetamine he used did not have

27  a substantial and injurious effect on the jury. For this reason, petitioner's appellate counsel was

28  not ineffective for failing to raise this claim of prosecutorial misconduct on appeal.

1  For the reasons discussed above, the undersigned finds that appellate counsel was not

2  ineffective for failing to raise the unmeritorious prosecutorial misconduct claims on direct appeal.

3  Instead, appellate counsel raised the stronger, although ultimately unsuccessful, claim challenging

4  the jury instruction addressing hallucinations.  Accordingly, petitioner has not demonstrated cause

5  for his failure to raise his prosecutorial misconduct claims on direct appeal.  In addition, for the

6  reasons discussed above, the undersigned also finds that petitioner has not demonstrated

7  prejudice as a result of the alleged prosecutorial misconduct.

8  *Fundamental Miscarriage of Justice*

9  The Supreme Court has limited the "miscarriage of justice" exception to habeas

10  petitioners who can show that "a constitutional violation has probably resulted in the conviction

11  of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327 (1995) (citing Murray v.

12  Carrier, 477 U.S. at 496); see Johnson v. Knowles, 541 F.3d 933, 936–38 (9th Cir. 2008) ("[t]he

13  miscarriage of justice exception is limited to those extraordinary cases where the petitioner asserts

14  his innocence and establishes that the court cannot have confidence in the contrary finding of

15  guilt.").

16  Petitioner does not claim actual innocence, nor do any of his defaulted claims support

17  such a claim.  For the reasons discussed above, the undersigned finds that claim 1, alleging

18  prosecutorial misconduct, does not implicate petitioner's actual innocence.

19  In claim 4, alleging trial court error, petitioner first alleges that the trial court erred

20  when it failed to admonish the jury, as requested by petitioner's trial counsel, when the prosecutor

21  wrongly argued that "express malice equals first degree, implied equals second degree."  (ECF

22  No. 1 at 34 citing RT at 1108.)  As discussed above, the trial court stated that it would instruct the

23  jury on the definition of first and second degree murder, which it later did.  The failure of the trial

24  court to admonish the jury does not implicate petitioner's actual innocence.

25  Petitioner next argues that the trial court erred when it "just sustained" trial counsel's

26  objection to the prosecutor's improper argument that "if you believe the defendant intended to kill

27  her like he said he said he did, second-degree murder doesn't apply."  (Id. citing RT at 1117.)  It

28  is unclear how petitioner is claiming trial court error in this claim.  In any event, the trial court's

1   failure to do more than sustain trial counsel's objection does not implicate petitioner's actual

2   innocence.

3          Petitioner next argues that the trial court erred when it failed to sustain trial counsel's

4   objection to the prosecutor's argument that second-degree murder is the lawful killing of a human

5   being with implied malice.  (Id. at 35 citing RT at 1117.)  The trial court ruled that this was not a

6   misstatement of the law, "It's an option."  (Id. citing RT at 1117.)  As discussed above, this ruling

7   was not improper.  In any event, this claim of trial court error does not implicate petitioner's

8   actual innocence.

9          Petitioner next argues that the trial court erred in ruling on trial counsel's objection to

10  the prosecutor's closing argument  (Id. citing RT at 1204):

11          Prosecutor:  If you don't find that there is sufficient evidence to
12          establish the premeditation and deliberation, you can still find
            implied malice and find the defendant guilty of second degree.
            Because you have to find that he implied an intent to kill her and
13          you can do that based on the number of shots, based on where he
            shot her.  Even if you don't believe he had the prerequisite that,
14          "I'm going to kill her," okay?  You don't get to manslaughter until
            you have decided that this is not a murder.

15
            Trial Counsel:  That is an incorrect statement of the law.
16
            Trial Court:  Well, if—they cannot find the defendant guilty of
17          manslaughter unless they find the defendant not guilty of murder.

18          Trial Counsel:  Uh-huh.

19          Trial Court:  I don't think that's incorrect, but –

20          Trial Counsel:  I think it –

21          Trial Court:  Well, there are several ways.

22          Trial Counsel:  Even if it is murder, you can –

23          Trial Court:  There are several ways of getting to manslaughter, and
            I will instruct the jury as to how to do that, also as to how to go
24          about their deliberations.  However, they can't find that defendant
            guilty of manslaughter unless they find the defendant not guilty of
25          murder.

26  (RT at 1204-05.)

27          Petitioner argues that the trial court should have ruled that the prosecutor misstated the

28  law.  (ECF No. 1 at 35-36.)  The trial court's ruling above was not improper and this claim does

                                    22

1    not implicate petitioner's actual innocence.

2              Petitioner argues that the trial court erred when it ruled on trial counsel's objections to

3    the prosecutor's closing argument where she mentioned her brother.  (Id. at 36 citing RT at 1210-

4    11.)  As discussed above, the trial court told the prosecutor to avoid talking about things not in

5    evidence.  Petitioner argues that the trial court did not rule with any kind of clarity and that the

6    prosecutor kept making statements that were of a personal nature.  (Id.)  The trial court's ruling

7    was proper and this claim does not implicate petitioner's actual innocence.

8              Petitioner also argues that the trial court should have sua sponte demanded that the

9    prosecutor stop testifying when she made the comment that petitioner would be dead if he used

10   the amount of methamphetamine that he claimed to use.  (Id.)  As discussed above, this argument

11   by the prosecutor was improper.  Assuming the trial court had a duty to cure the prosecutor's

12   misstatement sua sponte, for the reasons discussed above, this claim does not implicate

13   petitioner's actual innocence.

14             Finally, the undersigned finds that claim 5, alleging cumulative error (see ECF No. 1 at

15   37), also fails to implicate petitioner's actual innocence.

16             Accordingly, for the reasons discussed above, the undersigned finds that petitioner has

17   not demonstrated that a miscarriage of justice will occur if claims 1, 4 and 5 are not reviewed.

18             Claims 1, 4 and 5 should be denied on grounds that they are procedurally barred.

19   Claims 2 and 3

20             In claim 2, petitioner alleges ineffective assistance of trial counsel.  In particular,

21   petitioner alleges that trial counsel failed to object to the prosecution's closing argument where

22   she argued that petitioner would be dead if he smoked as much methamphetamine as he testified

23   to.  (ECF No. 1 at 30-31.)  In claim 3, petitioner alleges that appellate counsel was ineffective for

24   failing to raise the prosecutorial misconduct claims discussed above.  (Id. at 32-33.)

25             The Superior Court was the last state court to issue a reasoned decision addressing

26   petitioner's ineffective assistance of trial and appellate counsel claims.  Accordingly, the

27   undersigned considers whether the denial of these claims by the Superior Court was an

28   unreasonable application of clearly established Supreme Court authority.

The undersigned applies the standards set forth in Strickland v. Washington, supra, in evaluating petitioner's ineffective assistance of trial and appellate counsel claims.

The undersigned first considers petitioner's ineffective assistance of trial counsel claim. The undersigned above found that appellate counsel was not ineffective for failing to raise a prosecutorial misconduct claim based on the prosecutor's argument that petitioner would be dead if he smoked as much methamphetamine as he testified to. In particular, the undersigned found that while this argument was improper, it did not have an impact on the outcome of the trial. For the same reason, the undersigned finds petitioner was not prejudiced by trial counsel's failure to object to this argument. Because the denial of this claim by the Superior Court was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

Turning to petitioner's ineffective assistance of appellate counsel claim, the undersigned addressed the merits of this claim in the section above discussing petitioner's cause for the default of his prosecutorial misconduct claims. Based on the analysis above, the undersigned finds that the denial of petitioner's ineffective assistance of appellate counsel claim by the Superior Court was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after

1   service of the objections.  The parties are advised that failure to file objections within the

2   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

3   F.2d 1153 (9th Cir. 1991).

4   Dated:  October 21, 2014

5

6   Ber1871.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25